# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ALBERT CHAMBERS,<br><br>    Defendant. | Case No. 2:11-cr-00456-KJD-CWH<br><br>**REPORT AND RECOMMENDATION** |

      This matter was referred to the undersigned Magistrate Judge on Defendant Albert Chambers' Motion to Dismiss for Outrageous Government Conduct or Alternatively, Motion to Suppress for Fourth Amendment Violations (#18), filed on July 9, 2012. The Court also considered the Government's Response (#20), filed on July 26, 2012, and Defendant's Reply (#23), filed on August 3, 2012. An evidentiary hearing was held on September 17, 2012.

**I.     BACKGROUND**

      On December 21, 2011, Albert Chambers ("Chambers") was charged in a three count indictment for Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1), and Use or Possession of a Firearm in Relation to a Drug Trafficking Offense in violation of 18 U.S.C. § § 922(g)(1) and 924(c).

      On July 16, 2011, at approximately 9:45 p.m., Las Vegas Metropolitan Police Department ("LVMPD") Officers Nathaniel Schuller ("Schuller") and Michael Brinkley ("Brinkley") were driving their marked patrol vehicle on North Sandhill Street in Las Vegas. During their approximately six years of law enforcement experience, Schuller and Brinkley have made more than 200 arrests for robberies, burglaries, and narcotics while patrolling that area. Consequently, the officers consider that location to be a high crime area. As they drove by the Rayson Manor

1  Apartment Complex ("Rayson Manor"), Schuller and Brinkley observed Chambers pass through an
2  opening in the fence that surrounds an adjacent apartment complex and walk into Rayson Manor.
3  The officers testified that they are familiar with Rayson Manor and that "no trespassing" signs have
4  been posted there. Brinkley was aware of the existence of the hole in the fence, which appears to
5  have been caused by several vertical bars having been bent outward. The officers also testified that
6  they believed that Rayson Manor was publicly owned and consisted of women and children only
7  residents. David Ewing ("Ewing) testified in his capacity as Project Manager for the Department of
8  Housing and Urban Development. He oversees the administration of public housing in Las Vegas,
9  including Rayson Manor. Ewing said that there are no "women and children only" public housing
10 apartment complexes in Las Vegas.

11 Schuller and Brinkley were concerned about Chambers' behavior for several reasons. They
12 believed the use of the opening in the fence was an inappropriate method to move between the
13 apartment buildings. They also considered the time of night and that the complex is in a high crime
14 area. Finally, the officers felt that they had reasonable suspicion to conduct a consensual stop
15 based on their belief that Chambers was trespassing in a "women and children only" housing
16 complex. As a result, the officers stopped their vehicle in the parking lot near where Chambers was
17 walking and talking on his cell phone. Chambers looked over his shoulder towards them and made
18 eye contact, but continued to walk away. Schuller testified that once he got out of his patrol
19 vehicle, Chambers saw him and began to run. The officers did not recall specifically what words
20 were said, but believe that they identified themselves as "Metro" and attempted to make contact
21 with Chambers.

22 Schuller, who was wearing his khaki colored LVMPD police uniform, gave chase over a
23 space of about forty yards, and caught Chambers' shirt near his left shoulder in front of the door to
24 apartment three. Outside the door, a struggle ensued as Schuller tried to prevent Chambers from
25 entering the apartment. Chambers swung at Schuller in an effort to get away and opened the door
26 with his left hand. As Chambers entered the door, Schuller continued to hold onto him. During the
27 struggle Chambers broke loose and struck Schuller on the knee and hip with the door in an attempt
28 to close it. Schuller pushed the door open and continued to chase Chambers, who fled through the

2

1 apartment and out the other door.

2 Schuller testified that as Chambers was running away from him after exiting the apartment,
3 he saw Chambers reach toward his waistband with his right hand. Schuller yelled, "Metro Police,
4 Stop" and "Show me your hands" several times. When Chambers failed to comply, Schuller tased
5 Chambers in the back. Chambers fell to the ground, but did not surrender or show his hands as
6 ordered. Schuller testified that he saw Chambers reach for his waistband and Brinkley testified that
7 he saw a black object in Chambers' waistband. Chambers was tased a second time. Subsequently,
8 Chambers placed his hands out to the side, rolled over to his back, and was taken into custody.
9 When Chambers was brought to his feet, a pistol was discovered on the ground where he had been
10 laying. A search of Chambers' pockets revealed rock cocaine.

11 Later that evening, a search warrant was requested and obtained by Officer Daniel Woodard
12 ("Woodward"), who reported to the scene after Chambers was arrested. The search warrant sought
13 the seizure of a baccal swab to obtain Chambers' DNA. It indicates that Chambers had been
14 arrested after running away from police when they attempted to stop him for suspicion of
15 trespassing in a "women and children only" complex.

16 Officer Joshua Stearns ("Stearns") also testified as to his observations of Chambers at the
17 scene of the incident and during interview. Chambers told Sterns during the interview that he ran
18 straight to the apartment to get away after seeing Schuller and Brinkley. He indicated that he tried
19 to close and lock the door to escape from Schuller. Chambers also stated that he made sure to
20 conceal the gun from the officers, which he got for self-protection. He stated that he sometimes
21 stays at apartment three and takes the cocaine he owns from the apartment when he leaves to sell it
22 on Fremont street.

23 Finally, Latonya Griffin ("Griffin") testified that she is Chambers' girlfriend. She has
24 leased apartment three, the apartment into which Chambers ran, for several years. She was in the
25 parking lot near the apartment at the time of the incident and observed Chambers run into her
26 apartment while being chased by a police officer. Griffin testified that for four or five months prior
27 to the incident, Chambers stayed at her apartment overnight a few times per week. She indicated
28 that he kept clothes and personal effects there and contributed to the household by buying food,

3

1  paying electricity once, and occasionally watching her three children. She also testified that the
2  opening in the fence was commonly used by residents as a short cut to a local convenience store.
3       In the instant motion, Chambers requests that the Court dismiss the indictment for
4  outrageous government conduct. Alternatively, Chambers seeks the suppression of the pistol,
5  cocaine, and any inculpatory statements he made after his arrest alleging that the evidence was
6  obtained in violation of his Fourth Amendment rights.[1] Chambers also moves to suppress the
7  buccal swab results because the search warrant affidavit failed to inform the approving judge that
8  the police had entered the apartment without a valid warrant or probable cause. In response, the
9  Government argues that neither dismissal of the charges nor suppression of the evidence is
10 warranted because the officers lawfully approached Chambers, had reasonable suspicion to stop
11 him based on his unprovoked flight, and hot pursuit and exigent circumstances justify the officers'
12 actions. Consequently, the Government argues, Chambers' Fourth Amendment rights were not
13 violated.

## II.   DISCUSSION

The Fourth Amendment addresses "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. It protects a person's reasonable and legitimate expectation of privacy. *Katz v. United States*, 389 U.S. 347 (1967). As a result, evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

Police do not run afoul of the Fourth Amendment anytime they stop an individual. The Supreme Court has long held that police may stop a citizen at any time, ask for identification and

---

[1] The Court notes that Chambers make a general argument that his inculpatory statements made subsequent to his arrest should be suppressed as "fruit of the poisonous tree" because they were tainted by an illegal search and seizure. Chambers does not claim that his statements were obtained in violation of his *Miranda* rights. *See United States v. Johnson*, 445 F.Supp.2d 1181, 1184-85 (D. Nev. 2006) (citing the *Brown v. Illinois*, 422 U.S. 590 (1975) test for determining whether the issuance of *Miranda* warnings sufficiently attenuated the taint of an illegal arrest and finding the taint of the defendant's arrest was purged). Therefore, the Court will not address suppression of his statements under *Miranda*.

other information, and even request permission to search so long as a reasonable person in the citizen's position would recognize that he or she is free to leave or terminate the encounter. *See generally, Terry v. Ohio*, 392 U.S. 1 (1968); *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1 (1984). Indeed, police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions because "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

Moreover, under *Terry*, an officer may conduct a brief, investigatory stop if there is reasonable, articulable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. However, it requires at least a minimal level of objective justification for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry*, supra, at 27.

In assessing whether an officer has reasonable suspicion to conduct a *Terry* stop, reviewing courts look at the "totality of the circumstances" to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "An investigatory stop must be justified by some objective manifestation that the person stopped is or is about to be engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sigmond-Ballasteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273). A reviewing court's determination of reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418). The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot and observation of factors which are by themselves consistent with innocence, but may collectively amount to reasonable suspicion. *Id*. at 273-74. Reasonable suspicion is not a matter of hard certainties, but of probabilities. *Cortez*, 449 U.S. at 417-18.

5

### 1. Trespass

Officer Schuller testified that he believed he had reasonable suspicion to conduct a *Terry* stop based on his belief that Defendant Chambers was trespassing in an apartment complex restricted to women and children. Both officers Schuller and Brinkley testified that they observed Chambers pass through an opening in the fence that surrounds an adjacent apartment complex, Rayson Manor. The officers testified that they were familiar with the Rayson Manor complex and knew that "no trespassing" signs had been posted there. Officer Brinkley was aware of the existence of the hole in the fence. Both officers also testified that they believed at the time they saw Chambers go through the fence that Rayson Manor was publicly owned and restricted to only women and children as residents. This belief turned out to be untrue as HUD Project Manager Ewing testified that there are no "women and children only" public housing apartment complexes in Las Vegas.

As a result of the officers observations and beliefs, they stopped their vehicle in the parking lot near where Chambers was walking and talking on his cell phone to investigate their belief that Chambers was trespassing. Based on its review of the totality of the circumstances, the Court finds that the officers did not have a particularized and objective basis to conduct a *Terry* stop. At least initially, this appears to be exactly the type of inchoate and unparticularized suspicion of criminal activity *Terry* cautions against. There is no evidence any criminal activity had been reported in the area. Walking through an existing break in the fence of an adjacent apartment complex is not illegal. Indeed, Officer Brinkley was aware of the fence opening and testimony at the hearing indicated that it was a common short cut used by residents. There is nothing suggesting that the fence was designed to keep people out of, or provide security for, the residents of Rayson Manor. Given that the fence is not located on Rayson Manor property, was not intended to provide security for the residents of Rayson Manor, and does not lead directly to Rayson Manor property, the presence of "no trespassing" signs at Rayson Manor cannot provide reasonable suspicion that the crime of trespassing has occurred. The fence and the "no trespassing" signs are not connected. Consequently, the Court would have to conclude that the mere existence of "no trespassing" signs on Rayson Manor property, standing alone, is sufficient to trigger reasonable suspicion that activity

1  on the adjacent fenced property would lead to trespassing.  Neither the record nor the law support
2  this conclusion.
3          Nevada Revised Statute ("N.R.S.") Section 207.200 sets forth Nevada's trespassing
4  provision, and provides:

> 1. Unless a greater penalty is provided pursuant to N.R.S 200.603, any person who, under circumstances not amounting to a burglary:
> (a) Goes upon the land or into any building of another with intent to vex or annoy the owner or occupant thereof, or to commit any unlawful act; or
> (b) Willfully goes or remains upon any land or in any building after having been warned by the owner or occupant thereof not to trespass,
> is guilty of a misdemeanor.

9  Section 207.200 continues by listing the methods by which sufficient warning against trespassing
10 can be made, such as oral warnings or posting signs of certain dimensions in certain locations.
11 N.R.S. § 207.200(2)(b) and (d).  First, there is no evidence that the property immediately adjacent
12 to the fenced property was owned by Rayson Manor.  It appears that there is a strip of land between
13 the fence and Rayson Manor.  Consequently, when Chambers stepped through the fence he was not
14 even in a position where he could potentially be considered trespassing under the statute because
15 there is nothing to suggest he was "upon" Rayson Manor property.  Even assuming he stepped
16 directly onto Rayson Manor property, a reasonable interpretation of Section 207.200 would dictate
17 that if warning signs are posted, then they are subject to the owner or occupant granting permission
18 for an individual to visit.  To suggest otherwise would justify the arrest of any visitor regardless of
19 the property owner's permission or legitimate business of the visitor.  Such a construction is absurd
20 and Nevada statutes are construed to avoid absurd results.  *See G.C. Wallace, Inc. v. Eighth*
21 *Judicial Dist. Court*, 262 P.3d 1135, 1138 (Nev. 2011).  Consequently, at the time the officers
22 stopped their vehicle to investigate Chambers, they did not have reasonable and particularized
23 suspicion that criminal activity was afoot.

24          **2.      Investigatory Detention**

25          In spite of the fact that there was no reasonable basis to believe that Chambers was
26 trespassing or that criminal activity was afoot, the Court finds that Chambers' Fourth Amendment
27 rights were not violated during the initial encounter with Schuller and Brinkley.  The record shows
28 that when the officers stopped their vehicle, Chambers looked over his shoulder towards them and

made eye contact, but continued to walk away. Officer Schuller testified that once he got out of his patrol vehicle, Chambers saw him and began to run. The officers did not recall specifically what words were said when they exited the vehicle, but believe that they identified themselves as "Metro." Assuming that the officers identified themselves and told Chambers to stop, the Court finds that he was not improperly seized.

A person is not "seized" within the meaning of the Fourth Amendment unless "by means of physical force or show of authority, his freedom of movement is restrained . . . The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *United States v. Mendenhall*, 446 U.S. 544, 553-554 (1980) (citation omitted). In order to constitute a seizure in the absence of physical force, an officer's show of authority must be accompanied by the person's "submission to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ("[T]here is no seizure without actual submission; otherwise, there is at most an attempted seizure."). Chambers' momentary eye contact prior to fleeing from Schuller did not constitute submission to an assertion of authority. Indeed, the Ninth Circuit has expressly declined "to adopt a rule whereby momentary hesitation and direct eye contact prior to flight constitute submission to a show of authority." *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994). Accordingly, the Court finds that Chambers was not improperly seized during his initial encounter with Schuller and Brinkley.

### a.   Unprovoked Flight

Chambers' decision to flee from police, late at night and in a high crime area, provided Schuller and Brinkley with justification for further investigation. Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975); *Rodriguez*, 469 U.S. at 6; *Sokolow*, 490 U.S. at 8-9. The Supreme Court has recognized that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) *(citing Brown v. Texas*, 443 U.S. 47

(1979)). Nevertheless, officers may take into account the context in which suspicious activity occurs "in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow,* 528 U.S. at 124. For example, in *Florida v. Royer*, 460 U.S. 491 (1983), the Court held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has the right to ignore the police and go about his business. *Id*. at 498. Any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick,* 501 U.S. at 437.

> But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business;' in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.

*Wardlow*, 528 U.S. at 125. A valid stop can include the momentary restriction on a person's freedom of movement to maintain the status quo while making an initial inquiry. *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981). Otherwise, an officer could not perform a preliminary investigation of an alleged wrongdoing. *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). In cases where "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation," *Terry* recognized that the officers could "detain the individuals to resolve the ambiguity." *Wardlow*, 528 U.S. at 125.

Defense counsel argues that Chambers did not run from the officers nor did he push Schuller. Rather, Defense counsel asserts that Chambers walked away from the officers toward apartment three and attempted to close the door when Schuller forced his way in. As a result, Defense counsel argues that there was no flight, which would justify the officers' pursuit after Chambers refused to stop for questioning.[2] On the other hand, Schuller and Brinkley testified that

---

[2] Defense Counsel's characterization of the facts is misleading as it does not cite all of the relevant portions of Chambers' description of his actions. Defense Counsel contends that Chambers never fled from the officers, but rather walked through the fence to the door of apartment three. She also asserts that Chambers did not touch Schuller, but rather merely attempted to lock the door to apartment three. The Court notes that Chambers did not testify at the evidentiary hearing, but Defense Counsel referenced his Taped Interview with Stearns. *See* Govt. Exh. 8. In it, Chambers states, "I ran straight to the house trying to get away, you know um, then um when I came out the front door I was still on the

1  Chambers took off running almost immediately after Schuller got out of the patrol vehicle.
2  Additionally, Schuller testified that he gripped Chambers' shirt prior to stepping over the
3  doorframe, Chambers swiped at him while opening the door, and he was hit with the door when
4  Chambers attempted to close it.  It was reasonable for Schuller to infer from these actions that
5  Chambers was attempting to evade the LVMPD and may not have been authorized to be in
6  apartment three.  Accordingly, the Court finds that it was reasonable to pursue and physically
7  detain Chambers to explore the reasons for his unprovoked flight.

### 3.    Pursuit Into the Apartment

Chambers argues that police violated his Fourth Amendment rights when they entered the apartment without probable cause that a crime had been committed or a warrant.  The Government contends that the officers had reasonable suspicion to justify the *Terry* stop and subsequently obtained probable cause to believe Chambers committed a battery on Schuller, which resulted in a lawful entry based on "hot pursuit."

#### a.    Standing

Since the decision in *Katz v. United States*, 389 U.S. 347 (1967), it has been the law that the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).  A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as 'reasonable.'" *Id.* at 143-144, n. 12 (quoting *Katz*, *supra*, at 361).  Status as an overnight guest is enough to show an expectation of privacy in the home that society is prepared to recognize as reasonable.  *Minnesota v. Olson*, 495 U.S. 91, 95-97 (U.S. 1990).  In this case, Chambers was frequently an overnight guest in apartment

---

ground and I you know made sure I concealed . . . [the gun] while I was on the ground." *Id.* at 15 of 59. This statement contradicts his earlier statement that he just "kept walking and went straight in the house and when I was going into the house, I was like trying to close the door so I could hurry up and lock it and then they just rushed in and then the next thing you know I was just being chased." *Id.* at 4 of 59. Chambers' contradictory statements in this Taped Interview could be utilized as impeachment evidence to cast doubt on his allegation that he behaved in a manner consistent with a person who was lawfully refusing to answer police questions or submit to a consensual stop.

10

three, kept some belongings there, contributed to expenses, and watched the lessee's children. The Court finds that Chambers had sufficient standing to claim Fourth Amendment protection in apartment three.

### b. Applying *Terry* At the Threshold

The Supreme Court has found that the arrest of a person standing in an open doorway is lawful because the open doorway constitutes a public place and thus, there is no reasonable expectation of privacy associated with it. *United States v. Santana*, 427 U.S. 38 (1976). Moreover, the Supreme Court has found that a person may not thwart an arrest begun in a public place by retreating into the vestibule of the house. *Id.* In *Santana*, the defendant was standing in the open doorway of her front door when the police arrived. *Id.* She subsequently fled into her house and the police, having probable cause to believe that she had participated in a drug transaction, followed her into the residence to arrest her. The Court noted, "She was not merely visible to the public but was as exposed to public view, speech, hearing and touch as if she had been standing completely outside her house." *Id.* at 42. Accordingly, the Court concluded that the police could arrest the defendant based on *United States v. Watson*, 423 U.S. 411 (1976), which finds that police may arrest a person in a public place without a warrant if they have probable cause to believe a crime was or is being committed. *Id*.

Some courts from other jurisdictions have extended the *Santana* principle, which prohibits a person from thwarting an otherwise valid arrest by retreating into his house, to situations involving *Terry* stops. For example, in *Edwards v. United States*, 364 A.2d 1209 (D.C. 1976), an officer attempted to complete a lawful *Terry* stop by pursuing suspects into an apartment. The officer pushed the apartment door open before it closed completely and questioned the suspects inside the apartment. Relying on *Santana*, the *Edwards* court held that the officer had effected a proper *Terry* stop within the apartment. *See also, United States v. Gomez*, 495 F. Supp. 992, 1005 (S.D.N.Y. 1979) (finding a valid Terry stop occurred within the apartment and "continued pursuit of the suspects after they retreated and slammed the door did not contravene the Fourth Amendment"); *Harbin v. Alexandria*, 712 F. Supp. 67, 72 (E.D. Va. 1989) (officers need not cease attempts to effect an otherwise valid Terry stop merely because a suspect crosses from the porch of his house to

the living room through a still open door.)³

As in *Santana*, Schuller was not able to complete Chambers' detention at the doorway of apartment three. Schuller testified that he struggled with Chambers prior to Chambers opening the door and into the threshold of the doorway. When Chambers swung the door closed, it hit Schuller on the hip and knee. Schuller had reasonable suspicion based upon Chambers' unprovoked flight for a *Terry* stop. Schuller was justified to continue his efforts to detain Chambers, which started on the public street, continued into the doorway of apartment three, and pursue Chambers into the apartment to execute the detention.

The Court acknowledges that the Ninth Circuit has repeatedly held that an intrusion into a person's home may not be premised on *Terry's* reasonable suspicion standard. *See, e.g., United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (noting "the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures."); *LaLonde v. County of Riverside*, 204 F.3d 947, 955 (9th Cir. 2000) (noting "the reasons that gave rise to the rule in *Terry* are simply not applicable to a warrantless entry to seize a person within his home."); *United States v. Winsor*, 846 F.2d 1569, 1577-78 (9th Cir. 1988) (en banc) (rejecting the proposition that *Terry's* reduced standard can be applied to a warrantless entry to search for property within the home even when the search involves a highly limited intrusion). *And see, Payton v. New York*, 445 U.S. 573, 589 (1980) (reversing the state court ruling that relied on the premise that a warrantless entry to seize a person within a home can be held to *Terry's* standard). The cases that disapprove of *Terry* stops in the

---

³ Other courts have found that society has an interest in not rewarding the evasion of lawful police authority by allowing suspects who make it to their homes steps ahead of law enforcement officers to claim sanctuary. *See Gasset v. State*, 490 So.2d 97, 98-99 (Fla. 3d DCA 1986) ("The enforcement of our criminal laws, including serious traffic violations, is not a game where law enforcement officers are 'it' and one is 'safe' if one reaches 'home' before being tagged."). If such evasion were permitted, every attempt by police to stop a vehicle could potentially result in a race to the driver's home. *See, e.g., State v. Paul*, 548 N.W.2d 260, 267 (Minn. 1996) (noting that allowing police to enter a suspect's home only when in hot pursuit of a felon "would encourage drunk drivers to elude the police by racing through the streets to the sanctuary of their homes in order to 'freeze' a hot pursuit or to otherwise evade a lawful arrest"); *State v. Legg*, 633 N.W.2d 763, 773 (Iowa 2001) (finding warrantless entry into defendant's garage by officer who was in hot pursuit of her for the crime of interference with official acts).

home are distinguishable from this case because they do not involve the hot pursuit of a suspect who evaded investigative detention by escaping into his home. In particular, *Struckman* involved police entering the backyard of a private home based upon the 911 call of a neighbor who suspected the house might be burglarized. 603 F.3d at 735. *Lalonde* involved an investigation of a complaint for disturbing the peace that continued into the defendant's home when they found probable cause to arrest him. 204 F. 3d at 955. *Winsor* involved officers believing that the fleeing bank robber was located in a room of a hotel and demanding entry into every hotel room until they located him. 846 F.2d at 1571. *Payton* involved a "routine" arrest in a person's home. 445 U.S. at 582-83. In contrast, it was reasonable for Schuller to continue his pursuit of Chambers past the threshold of the apartment door because he had reasonable suspicion based on the unprovoked flight to detain Chambers pursuant to *Terry*, and did not believe Chambers lived there.

### c. **Probable Cause**

A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause. *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also, Atwater v. Lago Vista*, 532 US 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted). Absent probable cause, a warrantless arrest is illegal. *Id*.

The Government argues that when Schuller entered the apartment he had probable cause to arrest Chambers for battery on a peace officer. Under Nevada law, battery on a peace officer with substantial bodily harm is a Class B felony. *See* N.R.S. § 200.481(2)(c). Substantial bodily harm is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or prolonged physical pain." N.R.S. § 0.060. Absent substantial bodily harm, the battery is

a misdemeanor. N.R.S. § 200.481(a). In his effort to evade detention by fleeing into apartment three, Chambers struck Schuller with the apartment door. At that moment, Schuller had probable cause to arrest Chambers for battery. However, Schuller testified that he was struck by the door, received bruises and suffered soreness as a result, but did not require any other treatment for his injury. Accordingly, the Court finds that there was probable cause to arrest Chambers for a misdemeanor battery.

Notably, the probable cause standard is objective. Schuller testified that he attempted the *Terry* stop because of his suspicions regarding trespassing, not because he was the victim of a battery. Nevertheless, an officer's stated reason for exercising his discretion to arrest is immaterial if he has probable cause to arrest the suspect for any criminal offense. *See, e.g., Edgerly v. City and County of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010); *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404-05 (2006). Moreover, Chambers was not justified in attempting to shut the door on Schuller. *See Luchtel v. Hagemann*, 623 F.3d 975, 981 (9th Cir. 2010) (noting "a person does not have the right to resist arrest even if the charges are false or the arrest unlawful"). Consequently, the Court finds that the officers' entry into apartment three in pursuit of Chambers was justified by probable cause to arrest him for a misdemeanor battery.

### d. Exigent Circumstances

The Fourth Amendment provides a reasonable expectation of privacy in a variety of settings, but the "chief evil" it targets is the "physical entry of the home." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). Generally, police may not enter a home to arrest a person without an arrest warrant unless exigent circumstances exist. *See Payton*, 445 U.S. at 589; *see also*, *Welsh*, 466 U.S. at 748 (exigent circumstances limited when minor offense committed). "In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton*, 445 U.S. at 589. "Searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 586. Indeed, the Fourth Amendment draws "a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id*. at 590; s*ee also*, *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) (noting it is "clearly established Federal law that the

warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances"); *Struckman*, 603 F.3d at 738 ("the Terry exception to the warrant requirement does not apply to in-home searches and seizures.")

The exigent circumstances exception is premised on "few in number and carefully delineated" circumstances, *U.S. v. U.S. Dist. Ct. for the E.D. of Mich., S. Div., et al.*, 407 U.S. 297, 318 (1972), in which "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). The Ninth Circuit has previously defined those situations as (1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect, and (4) the need to prevent the escape of a suspect. *See, e.g., Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (en banc); *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002). Because the Fourth Amendment hinges on the reasonableness of the officer's actions in light of the totality of the circumstances, however, there is no immutable list of exigent circumstances; they may include "'some other consequence improperly frustrating legitimate law enforcement efforts.'" *Fisher*, 558 F.3d at 1075 (quoting *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir. 1989)). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Ojeda*, 276 F.3d at 488.

The hot pursuit exception to the warrant requirement applies when officers are in "immediate" and "continuous" pursuit of a suspect from the scene of the crime. *Welsh*, 466 U.S. at 753; *United States v. Salvador*, 740 F.2d 752, 758, n. 5 (9th Cir. 1984). Although exigent circumstances are less frequently found when the underlying crime is a misdemeanor, the misdemeanor nature does not "definitely preclude" such finding. *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001). "In almost all the cases refusing to find exigent circumstances where the underlying offense was a misdemeanor, the officers either knew that the suspect lived in the home in question or had no cause to believe that the suspect was not authorized to be in the home." *Garcia v. City of Imperial*, 2010 WL 3834020 (S.D. Cal. Sept. 28, 2010). The critical time for determining whether an exigency exists is the moment that the officer makes the warrantless

entry. *See Johnson*, 256 F.3d at 907.

Here, Schuller was in hot pursuit of Chambers to perform a justified *Terry* stop.[4] Chambers made clear his intent to escape from the officers by running, attempting to close the door, which resulted in a battery on Schuller, and continuing his flight through the apartment. The officers had no opportunity to identify Chambers or to determine why he ran into the apartment. They did not know whether he was an authorized guest of the apartment's lessee nor did they know whether there was any danger to people in the apartment. Additionally, Chambers' committed the underlying crime, although a misdemeanor, immediately prior to running through the apartment. There was no delay between the commission of the crime and Schuller's pursuit of Chambers through the apartment. Moreover, Schuller and Brinkley limited their time in the apartment to a brief run on a direct path through the apartment. They testified that they ran straight through the back door to the front door and did not remove evidence or search the apartment. Under these unique circumstances, exigent circumstances existed justifying the officers' warrantless entry into the apartment to arrest Chambers immediately after he committed a misdemeanor.

### 4. Seizure of the Pistol and Rock Cocaine

As Schuller pursued Chambers through the apartment and out the front door, he observed Chambers reach towards his waistband. After ordering Chambers to stop and show his hands, Schuller tased him, which caused Chambers to fall to the ground. Chambers was eventually handcuffed while lying face down on the ground. Once Chambers was brought to his feet, a pistol was observed, in plain view,[5] lying on the ground where he fallen. Chambers was placed into

---

[4] Defense Counsel alleged that exigent circumstances do not exist because the officers created the situation that led to Schuller being hit by the door and pursuing Chambers through the apartment. The Court is not persuaded by this argument for the reasons previously discussed, namely, that the officers had reasonable suspicion to perform a justified *Terry* stop based on Chambers' unprovoked flight.

[5] It is well established that the police may seize evidence in plain view without a warrant. *Coolidge v. N.H.*, 403 U.S. 443, 465 (U.S. 1971). The Supreme Court has limited warrantless seizures under the "plain view" doctrine to situations where the officer had a legal right to be at the location from which the object was plainly viewed. *See Horton v. California*, 496 U.S. 128, 136 (1990). As discussed above, Schuller's actions in pursuing Chambers and eventually detaining him did not violate the Fourth Amendment. In addition, to justify the "plain view" seizure, the incriminating nature of the object must

custody by Schuller at that time.  As discussed above, the officers had probable cause to believe that Chambers had committed a battery.  Once Chambers was arrested, a search incident to arrest was appropriate.  *See Chimel v. Cal.*, 395 U.S. 752, 762-763 (U.S. 1969) (warrantless searches incident to a lawful arrest are permitted under the Fourth Amendment for the purpose of finding weapons the arrestee might use or evidence the arrestee might conceal or destroy.)  Because the arrest was appropriate, seizure of the pistol as well as the cocaine from Chambers' pocket did not violate the Fourth Amendment.[6]

**B.     Motion to Dismiss for Outrageous Government Behavior**

Chambers moves to dismiss the indictment for outrageous government behavior. Specifically, Chambers contends that the LVMPD engaged in a pattern and practice of systematically stopping black males adults in low-income neighborhoods on the pretext that they are "trespassing" in "women and children only" neighborhoods.  As discussed above, the Court finds that Schuller and Brinkley were incorrect in their belief that the complex was for "women and children only."  Additionally, the officers were incorrect in their belief that they were justified to detain Chambers in the complex simply because of the presence of "no trespassing" signs. However, the officers did not act improperly in attempting to speak with Chambers or pursuing him to investigate his unprovoked flight in a high crime area.  The "outrageous government conduct" defense is available only where "the government is so involved in the criminal endeavor that it shocks our sense of justice."  *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. Cal. 1985); s*ee also, Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986) ("violation of 'fundamental fairness,

---

be immediately apparent and the officer must "have a lawful right of access to the object itself." *Id*. at 137.  The appearance of the pistol beneath Chambers when he was taken into custody was a matter to be investigated by the officers.  Therefore, the seizure of the pistol was reasonable.

[6] Because the Court finds that the arrest of Chambers was justified and therefore the pistol and rock cocaine are not fruit of the poisonous tree, it will not address the separate theory of whether the evidence would have inevitably been discovered during a pat-down in the investigative *Terry* stop context. *See Nix v. Williams*, 467 U.S. 431 (1984) (allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means).

shocking to the universal sense of justice'") (citations omitted). Constitutionally unacceptable conduct includes, but is not limited to, the following: situations where law enforcement agents employ unwarranted physical or mental coercion, where "government agents engineer and direct the criminal enterprise from start to finish," and where the government essentially manufactures new crimes in order to obtain the defendant's conviction. *See, e.g., United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. Cal. 1986); *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983). None of these circumstances appear in this case; the mistaken belief of the officers regarding the nature of Rayson Manner and status of Chambers' entry onto the property does not rise to the level of "outrageous government conduct." There is no evidence that the officers intended to induce Chambers to enter the property or to flee upon seeing them. Therefore, the Court finds that the motion to dismiss for outrageous government conduct should be denied.

### C. Search Warrant for the Buccal Swab

After Chambers was arrested, Woodard obtained a warrant to take a buccal swab in order to obtain Chambers' DNA. Chambers seeks suppression of the buccal swab evidence because the affidavit presented to the judge to obtain the warrant omitted a material fact. Specifically, Chambers alleges that the affidavit failed to disclose that the officers entered the apartment without a warrant to take Chambers into custody. As a result, Chambers contends that the judge might have decided that the entry into the apartment was illegal and therefore might not have approved the warrant. In response, the Government contends that the warrant is valid on its face and the alleged omission was not material to the determination of probable cause.

The Fourth Amendment provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation." U.S. Const. Amend. IV. The Supreme Court has noted that the traditional standard of review of an issuing magistrate's probable cause determination "is simply to ensure that the magistrate had a 'substantial basis for . . . concluding" that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). Suppression is an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware,* 438 U.S. 154 (1978). When a search warrant includes illegally obtained

information, the offending facts should be purged and the remaining information in the affidavit should be examined to determine whether it provides a substantial basis for concluding that the search warrant was supported by probable cause. *See United States v. Grandstaff*, 813 F.2d 1353, 1355 (9th Cir. 1987) (finding that an excised affidavit still afforded the magistrate a substantial basis for concluding that the search warrant would uncover wrongdoing); s*ee also, United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. Wash. 2001) (same).

As discussed above, the Court finds that the officers' entry into the apartment in hot pursuit of Chambers did not violate the Fourth Amendment. Additionally, the search warrant did not address any evidence in the apartment, but rather, seizure of epithelial cells within Chambers' mouth for the purposes of identification. Woodward did not have a duty to include a suggestion that the prior foot pursuit of Chambers was illegal. Chambers did not present evidence that Woodward acted with reckless disregard for the truth, knowingly provided false statements, or made a material omission. Accordingly, the search warrant issued by the Judge was not tainted by an act violating Chambers' Forth Amendment right. Therefore, the Court finds that suppression of the buccal swab is not warranted.

Based on the foregoing and good cause appearing therefore,

## RECOMMENDATION

IT IS HEREBY RECOMMENDED that Defendant Albert Chambers' Motion to Dismiss for Outrageous Government Conduct or Alternatively, Motion to Suppress for Fourth Amendment Violations (#18) be denied.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. Thomas v. Arn, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. Martinez v. Ylst, 951 F.2d 1153,

1157 (9th Cir. 1991); Britt v. Simi Valley United Sch. Dist., 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 21st day of November, 2012.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**